**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| JOY G. FRANKLIN, on behalf of herself and all others similarly situated,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>DUKE UNIVERSITY, THE RETIREMENT BOARD FOR DUKE UNIVERSITY, and JOHN/JANE DOES 1–10,<br><br>　　　　　　　Defendants. | **Civil Action No.:**<br><br><br><br><br><br><br><br>**COMPLAINT - CLASS ACTION** |

Plaintiff Joy G. Franklin, by and through her undersigned attorneys, on behalf of herself and all others similarly situated, states and alleges matters pertaining to herself and her own acts, upon personal knowledge, and as to all other matters, upon information and belief, based upon the investigation undertaken by her counsel, as follows:

## I.　INTRODUCTION

1.　　This is a case about Defendants unlawfully shortchanging retirees of the Employees' Retirement Plan of Duke University (the "**Plan**") by millions of dollars through their use of outdated mortality tables in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA"). By using outdated mortality tables to calculate joint and survivor annuities and preretirement survivor annuities for Plan participants prior to July 1, 2023, Defendants harmed the financial security of its former employees and their loved ones, to Defendants' financial gain.

1

2. Defendants had a fiduciary duty to act loyally and "solely in the interest of the participants and beneficiaries[,]" the duty to act with "care, skill, prudence, and diligence." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1). Defendants disregarded that duty, electing to use unreasonable and outdated formulas for determining certain types of pension benefits prior to July 1, 2023, that substantially underpaid participants of the Plan for Defendants' own financial gain.

3. Plaintiff brings this class action against Defendants Duke University ("**Duke**"), the Plan, the Duke Retirement Board (the "**Board**"), and the individual members of the Board during the relevant time period (collectively, with Duke, the Plan, and the Board, "**Defendants**") for violations of ERISA's actuarial equivalence requirements.

4. Plaintiff and the Class (as defined below) are vested participants in the Plan, which deprives them of monies to which they are entitled. Plaintiff and Class Members are retired employees (and their beneficiaries) who began receiving pension benefits before July 1, 2023, as a joint and survivor annuity or a preretirement survivor annuity.

5. Until recently, Defendants used outdated formulas, which, upon information and belief, are based on outdated actuarial assumptions, to calculate these types of benefits. Defendants were aware of the outdated formulas used to calculate these types of benefits. They failed to update the formulas sooner or amend the Plan, so the updated formulas would apply retroactively. The Plan's old formulas caused Plaintiff and Class Members to receive less than the "actuarial equivalent" of their vested benefits, in violation of ERISA's actuarial equivalence requirements.

6. Duke sponsors the Plan, under which participants earn pension benefits as a single life annuity ("**SLA**"). An SLA is a monthly benefit for the life of the participant. However, participants can elect to receive their pension benefits in forms other than an SLA, such as a certain and life annuity or a joint and survivor annuity ("**JSA**").

7. For married participants, the default form of pension payment is a JSA, which provides retirees with a monthly annuity for their lives and, when they die, a contingent annuity for the life of their spouse or beneficiary. *See* 29 U.S.C. § 1055(a). Plans label JSAs as a percentage of the benefit paid during the beneficiary's life. A 50% JSA pays the spouse half the amount the retiree received each month; a 75% JSA pays the spouse three-quarters of what the retiree received each month; a 100% JSA pays the beneficiary the same amount the retiree received. Unless they choose otherwise and obtain their spouses' consent, participants who are married when their benefits commence automatically receive a 50% JSA.

8. To convert the SLA to the JSA, the Plan uses conversion factors based on actuarial assumptions — consisting of an interest rate and mortality table — to determine the amount by which it reduces a participant's SLA to arrive at the monthly JSA benefit amount. A JSA recipient's monthly amount will generally be less than the amount he or she would receive as an SLA because pension plans must account for paying benefits for two lives (the retiree and his or her beneficiary) rather than one. This case concerns how Defendants unlawfully reduced the SLA for participants receiving certain types of benefits before July 1, 2023, to arrive at the monthly benefit amount.

9.     ERISA requires that JSA benefits that pay between 50% to 100% (also known as "**Qualified Joint and Survivor Annuities**" or "**QJSAs**") be at least the "actuarial equivalent" of the retiree's SLA. *See* 29 U.S.C. § 1055(d); *see also* § 1055(e) (discussing the qualified preretirement survivor annuity and how benefits must not be less than the amount that would be payable as a survivor annuity under a QJSA).

10.    Two benefit forms are actuarially equivalent when the present values of the two benefits are the same, based on reasonable actuarial assumptions. Calculating present value requires interest rates and mortality tables. Interest rates discount the value of expected future payments to the date of the calculation. Because of the time value of money, a dollar today is worth more than a dollar in the future because that dollar can be invested today and earn interest. As a result, to calculate the value of a benefit stream one must use a rate to discount the future payments to today's dollars. Mortality tables predict the rate at which retirees will die at any given age and, therefore, the chance they will receive an additional year of benefits. The interest rate and mortality table work together to generate a "conversion factor" that is applied to a participant's SLA. Once applied, the conversion factor reduces the SLA to arrive at an alternate benefit form. The actuarial assumptions used in the formula directly impact the conversion factor.

11.    For the last several decades, mortality rates have improved. Generally, retirees today live longer than retirees from the 1960s and 1970s. Accordingly, mortality tables based on data from the 1960s predict that people will die earlier than contemporary mortality tables. All else being equal, using an older mortality table to calculate a

4

conversion factor decreases the present value of an optional benefit form and, in turn, the monthly amount retirees receive. For example, a plan using a mortality table from the 1970s to calculate a 50% JSA — interest rates being equal — may produce a conversion factor of 0.90. In this scenario, a participant entitled to a monthly SLA benefit of $1,000 would receive $900 per month as 50% JSA (his or her spouse would receive $450 per month). By contrast, a plan using a mortality table from 2023 — interest rates being equal — may produce a conversion factor of 0.93. The same retiree would receive $930 per month as a 50% JSA (his or her spouse would receive $465 per month).

12. When plans make actuarial conversions from one benefit form to another or from normal retirement age to early retirement, ERISA's actuarial equivalence requirements apply. These statutory requirements, along with the associated Treasury regulations, are meant to ensure that, all else being equal, the forms of pension benefit that a retiree receives, and the time they receive those benefits relative to their normal retirement age, are *at least* as valuable as the SLA they would receive at normal retirement age. *See* ERISA §§ 205(d) and (e) and 204(c)(3), 29 U.S.C. §§ 1055(d) and (e) and 1054(c)(3); 26 C.F.R. § 1.401(a)-20, Q&A 16. ERISA's actuarial equivalence requirements help ensure that married participants receiving JSAs and early retirees are not penalized for their choices, regardless of the optional form they select or when they retire.

13. ERISA § 204(c)(3) requires that an employee's accrued benefit, if it "is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . shall be the actuarial equivalent of such benefit[.]" 29 U.S.C. § 1054(c)(3). Failing

5

to provide a participant with at least the actuarial equivalence of his or her vested benefit results in an illegal forfeiture in violation of ERISA § 203(a), 29 USC § 1053(a).

14.     Defendants violated ERISA's actuarial equivalence requirements by using outdated formulas that produce unreasonably low conversion factors and, therefore, depressed the value of JSAs and QPSAs that began before July 1, 2023. Despite the considerable increases in life expectancy over the past 50 years, Defendants continued to use outdated formulas to calculate pension benefits for participants until two months ago. The formulas used by the Plan to determine JSA and QPSA benefits produce conversion factors that are consistently lower than those produced by the Plan's newly updated formulas and those produced by using contemporary actuarial assumptions like the ones released by the Treasury. As a result, participants who began receiving benefits prior to July 1, 2023, in the form of a JSA or QPSA receive less than they would if Defendants used current and reasonable actuarial assumptions.

15.     After decades of using the same outdated formulas to calculate QJSAs and QPSAs, Defendants updated the Plan's formulas for calculating these types of benefits on May 17, 2023. Starting on July 1, 2023, participants who began receiving QJSAs or QPSAs had their benefits determined using formulas based on higher conversion factors. Accordingly, a 65-year-old participant with a spouse the same age who accrued an SLA of $1,000 per month would get a 50% JSA of $880 per month if he began collecting benefits on June 1, 2023. However, the same participant would receive $915 per month if he began collecting benefits on July 1, 2023.

6

16.     Defendants' use of outdated formulas, based on outdated actuarial assumptions, for determining certain types of benefits prior to July 1, 2023, violated ERISA's actuarial equivalence requirements and caused Plaintiff and the Class to receive less than they would if Defendants used formulas based on reasonable and current actuarial assumptions required by ERISA and the accompanying Treasury regulations.

17.     The damage caused by Defendants' unlawful use of formulas based on unreasonable actuarial assumptions to calculate benefits prior to July 1, 2023, has negatively affected and will continue to negatively affect Plaintiff and Class Members for the rest of their lives (and the lives of their spouses, too).

18.     Plaintiff brings this action on behalf of a Class of retirees receiving JSAs between 50% and 100% and QPSA recipients who began receiving benefits before July 1, 2023, pursuant to ERISA § 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3). Plaintiff seeks all appropriate equitable relief, including but not limited to a declaration that the Plan's old formulas for determining JSAs and QPSAs violated ERISA's actuarial equivalence and non-forfeitability requirements; an injunction requiring the Plan's fiduciaries to ensure that the Plan pays actuarially equivalent benefits to all Class members; an Order from the Court requiring Defendants to pay all amounts improperly withheld in the past and that they will withhold in the future; an Order requiring Defendants to recalculate Plaintiff and the Class's JSA and QPSA benefits in accordance with ERISA's actuarial equivalence requirements; an Order requiring Defendants to increase the amounts

of Plaintiff's and the Class's future benefit payments, and any other relief the Court determines to be just and equitable.

## II.    JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

20.    This Court has personal jurisdiction over Duke because it is located in this District, transacts business in this District, employs people in this District, and has significant contacts with this District, and because ERISA provides nationwide service of process.

21.    This Court has personal jurisdiction over the Plan because it offers and pays pension benefits to participants in this District and because ERISA provides nationwide service of process.

22.    This Court has personal jurisdiction over the Board because it offers and pays pension benefits to participants in this District and because ERISA provides nationwide service of process.

23.    This Court has personal jurisdiction over the individual members of the Board because, upon information and belief, each transacts business in, resides in, and has significant contacts with this District and because ERISA provides nationwide service of process.

8

24. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendants may be found in this District, employed Plaintiff Franklin and other Class members in this District, and otherwise does business in this District.

## III. <u>PARTIES</u>

25. Plaintiff Joy G. Franklin resides in Durham, North Carolina, and is a Participant in the Plan. She worked for Duke for approximately 18 years. Her benefits, which Defendants calculated using the Plan's unreasonable formulas, began on March 1, 2018, and she elected the 50% JSA offered by the Plan as a "Qualified" JSA with her husband as the beneficiary.

26. Duke is a private research university in Durham, North Carolina, is a member of the Association of American Universities, and is consistently ranked among the top universities in the country. Duke is the "plan sponsor" for the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

27. The Plan is a defined benefit plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35). The Plan is joined as a nominal defendant pursuant to Rule 19(a) of the Federal Rules of Civil Procedure to assure that complete relief can be granted. Pursuant to 29 U.S.C. § 1102, Defendants established the Plan and maintained it pursuant to a written instrument known as a "Plan Document."

28.     Upon information and belief, the Board is an unincorporated association based in Durham, North Carolina. The Board is an acting fiduciary under ERISA.[1] The Duke Board of Trustees appoints the members of the Board, and the Vice President for Total Rewards is the chairman of the Board.

29.     John/Jane Does 1 through 10, inclusive, are the individual members of the Board and the current and former Vice Presidents for Total Rewards who were and are responsible for administering the Plan throughout the relevant time period. Their names and identities are not currently known. Upon information and belief, each transacts business in, resides in, and has significant contacts with this District.

## IV.     BACKGROUND

### A.     *Actuarial Equivalence Under ERISA*

30.     Actuarial equivalence is a "term of art" (*Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011)), which "Congress intended [] to have its established meaning." *McDermott Int'l, Inc. v. Wilander*, 498 US 337, 342 (1991). If "Congress has used technical words or terms of art, it is proper to explain them by reference to the art or science to which they are appropriate." *Corning Glass Works v. Brennan*, 417 US 188, 201 (1974) (citations omitted). "And so, it makes sense that when the 'appropriate methodology' for calculating an actuarially-equivalent value 'is not apparent from the face

---

[1] *See* the Plan Document for the Plan, as amended and restated through July 1, 2014 (the "Plan Doc"), Article 6 (stating the Board "shall have the responsibility and discretionary authority to control the operation and administration of the Plan in accordance with its terms").

Case 1:23-cv-00833-CCE-JLW     Document 1     Filed 09/29/23     Page 10 of 47

of the definition of actuarial equivalence, nor from the statute or regulations as in effect,' courts look 'to practice within the field of actuarial science.'" *Adams v. US Bancorp*, No. 22-cv-509, 2022 US Dist. LEXIS 188713, at *16 (D. Minn. Oct. 17, 2022) citing *Pizza Pro Equip. Leasing v. Comm'r*, 147 TC 394, 412 (2016), *aff'd*, 719 F. App'x 540 (8th Cir. 2018).

31.     At the heart of actuarial equivalence calculations is the concept of "***present value***." Actuarial equivalence describes two benefit streams as having equal present values. As the Court of Appeals for the DC Circuit explained: "Two modes of payment are actuarially equivalent when their ***present values*** are ***equal*** under a given set of assumptions." *Stephens*, 644 F.3d at 440 (emphasis added) (citing Jeff L. Schwartzmann & Ralph Garfield, Education and Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1-24-91 (1991) ("Schwartzmann & Garfield"). Relying on the Society of Actuary's definition of actuarially equivalent benefits, the *Stephens* court instructed that "within the actuarial field, 'actuarial equivalen[ce]' is understood to require a present-value calculation." *Adams*, No. 22-cv-509, 2022 US Dist. LEXIS 188713, at *16 citing *Stephens*, 644 F.3d at 440.

32.     Present value is the value of a payment stream on a specific measurement date adjusted for the time value of money. The Society of Actuaries[2] defines the "Present Value" of a cash flow as the "value of a future cash flow given by a present value model

---

[2] The Society of Actuaries ("SOA") is a global professional organization for actuaries founded in 1949 that provides the exams, certifications, and continuing education necessary to practice as an actuary in the US.

under a particular set of assumptions about **future economic or other conditions** . . . ."[3]
Simply put, present value is the value of an amount of money today in terms of its worth
in the future.

33.     Like the Society of Actuaries, ERISA defines "present value" as "the value
adjusted to reflect **anticipated events**." ERISA § 3(27), 29 U.S.C. § 1002(27). Such
adjustments, the definition continues, "shall conform to such regulations as the Secretary
of the Treasury may prescribe." *Id.*

34.     Calculating present value requires two primary ingredients: (1) an interest
rate and (2) a mortality table. An interest rate discounts future dollars to the present. The
rate is often called a "discount rate," which is the rate of return one could earn on an
investment. *See Berger v. Xerox Corp. Retirement Income Guar. Plan*, 338 F.3d 755, 759
(7th Cir. 2003). ("A discount rate is simply an interest rate used to shrink a future value to
its present equivalent."). A mortality table shows the rate of deaths occurring during a
selected time interval and predicts the likelihood of death for an individual within the
current year.[4]  Using discount rates and mortality tables, an actuary can determine whether
two benefit forms (e.g., an SLA and JSA) are actuarially equivalent by comparing the
present values.

---

[3]   (Emphasis added), *see* Society of Actuaries, Glossary. Available at:
https://www.soa.org/4a537f/globalassets/assets/files/edu/actuarial-glossary.pdf      (last
accessed May 22, 2023).

[4] *See* Society of Actuaries, definition of "Mortality" *supra* note 3.

35. ERISA's actuarial equivalence requirements help ensure that pension plan participants receive at least the same value of monthly benefit regardless of the benefit form. The notion is that a participant should not be penalized for selecting one form of pension benefit over another.

36. Under ERISA, defined benefit plans must offer at least two payment options: one for married participants (i.e., JSAs) and one for unmarried participants (i.e., SLAs). However, a JSA could pay out for longer because plans make payments to the participant and, potentially, the beneficiary. Therefore, if the monthly payment to the participant remains the same, a JSA will be more expensive than an SLA because the beneficiary may also receive payments.

37. To account for the additional value from a JSA, plan sponsors reduce the participant's SLA or the monthly amount he or she will receive. Plans use formulas based on actuarial assumptions to determine the amount of the reduction to the SLA. The actuarial assumptions generate a conversion factor that is applied to the SLA to determine the reduction in benefits to arrive at the JSA amount. To ensure plans do not shortchange participants and their beneficiaries on their JSA benefits, Congress required that JSAs be at least "actuarial[ly] equivalent" to the SLAs offered to non-married participants. *See* 29 U.S.C. § 1055(d); *see also* 26 U.S.C. § 417 (same requirement under the Tax Code). Accordingly, actuarial equivalence should be cost-neutral, whereby the "cost" to the plan should be the same regardless of the benefit the participant selects.

13

38.     ERISA's actuarial equivalence requirements impose duties on pension plans in form and timing. *See Esden v. Bank of Bos.*, 229 F.3d 154, 163 (2d Cir. 2000) ("What these provisions [ERISA's actuarial equivalence provisions] mean in less technical language is that: (1) the accrued benefit under a defined benefit plan must be valued in terms of the annuity that it will yield at normal retirement age; and (2) if the benefit is paid at ***any other time*** (e.g., on termination rather than retirement) or in ***any other form*** (e.g., a lump sum distribution, instead of annuity) it must be worth at least as much as that annuity.") (Emphasis added.).

39.     With regards to the ***form*** of pension benefit, ERISA requires that qualified JSAs ("QJSAs") be at least the actuarial equivalent of the value of the SLA offered to the retiree at the times benefits commence. 29 U.S.C. § 1055(d)(1). The Tax Code repeats this definition at 26 U.S.C. § 417(b)(2) (defining QJSA as "the actuarial equivalent of a single annuity for the life of the participant") and § 417(g)(2) (defining QJSA as "the actuarial equivalent of a single annuity for the life of the participant").[5] A plan can offer multiple QJSAs ranging from 50% to 100%. 29 U.S.C. § 1055(d)(1).

40.     A plan must designate one of the QJSAs as the default option for married participants, which can be more valuable than the other QJSAs offered (26 C.F.R. §

---

[5] The Internal Revenue Code (the "Tax Code") has parallel provisions for ERISA's actuarial equivalence requirements, and the Treasury regulations provide further guidance into the rules. *See* 26 U.S.C. §§ 417(b)(2), 411(c)(3); *see also* 26 C.F.R. § 1.411(c)-1(e) (referring to the "actuarial equivalence" of the participant's accrued benefit in conformance with Treasury regulations).

14

1.401(a)-20, Q&A 16) but must be *at least* the actuarial equivalent of the SLA (29 U.S.C. § 1055(d)(1)). If the plan offers optional forms of benefit that are more valuable than the SLA, then the default QJSA must be of at least equal value to that benefit form. *See* 26 C.F.R. § 1.401(a)-20, Q&A 16. That way, married and unmarried participants have at least one form of benefit available to them that is equivalent to the most valuable benefit form.

41.    Under ERISA, plans must also offer a qualified preretirement survivor annuity ("**QPSA**"). *See* ERISA § 205(a)(2), 29 U.S.C. § 1055(a)(2). A QPSA is an annuity paid to the participant's surviving spouse if the participant dies before his or her benefits commence. *See* ERISA § 205(e), 29 U.S.C. § 1055(e). A QPSA must be at least the actuarial equivalent of the amount the spouse would have received if the participant had selected the plan's default QJSA and died. ERISA § 205(e)(1)(A), 29 U.S.C. § 1055(e)(1)(A).

42.    With regards to the ***time*** a retiree opts to start receiving benefits, ERISA requires that "if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit[.]" § 204(c)(3), 29 U.S.C. § 1054(c)(3). ERISA defines "normal retirement age" as age 65, or younger if provided by the pension plan. ERISA § 3(24), 29 U.S.C. § 1002(24); *see also* 26 U.S.C. § 411(a)(8); Treas. Reg. § 1.411(a)–7(b). In other words, if a participant chooses to begin receiving benefits prior to the "normal retirement age," the benefit must be at least the actuarial equivalent of the amount the retiree would have received as an SLA at the normal retirement age.

15

43.     ERISA § 203(a), 29 U.S.C. § 1053(a), provides that an employee's right to the vested portion of his or her normal retirement benefit is nonforfeitable. The Treasury regulation, which "defines the term 'nonforfeitable' for purposes of these [non-forfeitability] requirements," 26 C.F.R. § 1.411(a)-4(a), states that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable." Therefore, distributions of retirement benefits that are less than their actuarial equivalent value constitute an impermissible forfeiture under ERISA § 203(a), 29 U.S.C. § 1053(a).

### B.     *Actuarial Equivalence Requires Reasonable Assumptions*

44.     Reasonable assumptions must underlie the actuarial computation of present value to achieve equivalence.[6] As discussed above, ERISA defines "present value" as "the value adjusted to reflect ***anticipated events***. Such adjustments, the definition continues, "shall conform to such regulations as the Secretary of the Treasury may prescribe." *Id.* (emphasis added.)

45.     The Treasury regulations repeatedly reference using reasonable assumptions when performing actuarial equivalence calculations. For example, the Treasury regulation concerning QJSAs provides that "[e]quivalence may be determined, on the basis of consistently applied ***reasonable actuarial factors***, for each participant or for all

---

[6] "To be equivalent means to be 'equal in force, amount, or value.' [Definition of] *Equivalent*, Merriam-Webster, https://www.merriam-webster.com/dictionary/equivalent. Only accurate and ***reasonable actuarial assumptions*** can convert benefits from one form to another in a way that results in equal value between the two." *Urlaub v. CITGO Petro. Corp.*, Docket No. 21 C 4133, 2022 US Dist. LEXIS 30616, at *19–20 (ND Ill. Feb. 22, 2022).

participants or reasonable groupings of participants." 26 C.F.R. § 1.401(a)-11(b)(2) (emphasis added). Likewise, the Treasury regulation discussing protected accrued benefits defines "[a]ctuarial present value" as meaning "determined using ***reasonable actuarial assumptions***." 26 C.F.R. §1.411(d)-3(g)(1) (emphasis added). Further, when making actuarial reductions to determine the early retirement benefits of terminated vested participants — which 29 U.S.C. § 1056(a)(3) governs — the corresponding Treasury regulations instruct plans to use "reasonable actuarial assumptions." 26 C.F.R. § 1.401(a)-14(c)(2). It "would be strange for the [Treasury] Commissioner to provide greater protection to participants who were terminated before reaching minimum early-retirement age rather than those who are active." *Adams*, 2022 US Dist. LEXIS 188713, at *21.

46. There is also a reasonableness requirement for lump-sum distributions. Indeed, within the context of cash balance plans, the regulations require optional forms of benefit to be actuarially equivalent "using reasonable actuarial assumptions." 26 C.F.R. § 1.411(a)(13)-1(b)(3). When comparing optional forms of benefits to a QJSA, plans must use either the "applicable" morality table and interest rates, which are "considered reasonable actuarial assumptions," or specify their own "reasonable interest rate and reasonable mortality table." 26 C.F.R. §§ 1.417(a)(3)-1(c)(2)(iv)(A)–(B) and (f)(ii)(2)(i)(A)–(B). As the court in *Adams* stated: "***A reasonableness requirement is consistent with ERISA's structure and purpose***." *Adams*, No. 22-cv-509, 2022 US Dist. LEXIS 188713, at *21 (emphasis in original).

17

47.     The American Academy of Actuaries (the "Academy"), a professional organization that represents and unites actuaries in all practice areas, similarly requires using reasonable actuarial assumptions. In 1988, the Academy created the Actuarial Standards Board ("ASB"), which promulgates standards of practice for the entire profession in the United States. The ASB issues actuarial standards of practice ("**ASOPs**") that discuss how each demographic (i.e., mortality) and economic (i.e., interest rate) assumption that an actuary selects must be reasonable. *See* ASOP Nos. 35 and 27.

48.     The ASOPs, published by the ASB, dictate that "each economic assumption used by an actuary should be reasonable." *See* ASOP 27, para. 3.6. An assumption is "reasonable" if it "reflects the actuary's professional judgment," "takes into account historical and current economic data that is relevant as of the ***measurement date***," and "reflects the actuary's estimate of future experience." *Id.* (emphasis in original).

49.     ASOP 35, discussing Demographic and Other Noneconomic Assumptions, explains that an actuary "should select reasonable demographic assumptions in light of the particular characteristics of the defined benefit plan that is the subject of measurement."[7] Para. 3.3.5 — titled "Select a Reasonable Assumption" — echoes this idea and states that an assumption is reasonable if it "reflects the actuary's professional judgment," "takes into

---

[7] *See* ASOP 35, Section 3 Analysis of Issues and Recommended Practices. Available at: https://www.actuarialstandardsboard.org/asops/selection-of-demographic-and-other-noneconomic-assumptions-for-measuring-pension-obligations/ (last accessed May 22, 2023).

account historical and current demographic data that is relevant as of the ***measurement date***," and "reflects the actuary's estimate of future experience." *Id.* (emphasis in original).

50.     Courts have also signaled that plans should use reasonable actuarial assumptions to calculate pension benefits. *See Smith v. Rockwell Automation, Inc.*, 438 F. Sup. 3d 912, 921 (ED Wis. 2020) ("plans must use the kind of actuarial assumptions that a reasonable actuary would use at the time of the benefit determination"); *Masten v. Metropolitan Life Ins. Co. Empl. Bens. Committee*, 543 F. Sup. 3d 25, 33 (SDNY 2021) ("the Court finds it plausible that the Plan's use of decades-old mortality tables is not a 'reasonable' actuarial assumption in light of the ready availability of updated alternatives . . . the Court concludes that ***ERISA requires that Plan administrators use reasonable actuarial assumptions when converting SLAs into alternative benefits***" (emphasis added); *Urlaub,* 2022 US Dist. LEXIS 30616, at *19 ("it cannot possibly be the case that ERISA's actuarial equivalence requirements allow the use of unreasonable mortality assumptions"); *Dooley v. Am. Airlines, Inc.*, No. 81-C-6770, 1993 US Dist. LEXIS 15667, 1993 WL 460849, at *11 (ND Ill. Nov. 4, 1993) ("The term 'actuarially equivalent' means ***equal in value*** to the present value of normal retirement benefits, determined on the basis of actuarial assumptions with respect to mortality and interest which are ***reasonable*** . . . .") (emphasis added).

51.     The assumptions pension plans use to determine actuarial equivalence are not reasonable simply by being expressed in the plan document. *See Laurent v. Pricewaterhouse Coopers LLP*, 794 F.3d 272, 286 (2d Cir. 2015) ("ERISA did not leave

19

plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit"); *Esden*, 229 F.3d at 164 ("If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of 'actuarial equivalence'").

## V.     <u>FACTUAL ALLEGATIONS</u>

### A. *The Plan*

52.     Duke established the Plan on July 1, 1959, to "help provide [Duke retirees] with lifetime income when [they] retire." *See* the Summary Plan Description for the Plan (hereinafter the "**SPD**").

53.     The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined benefit plan" within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

54.     The Plan is administered by the Board. *See* Plan Doc, § 6.01.

55.     Participants in the Plan are current and former Duke and Duke Health System, Inc. employees who are not eligible to receive employer contributions under the Duke University Faculty and Staff Retirement Plan. The Plan covers individuals employed in a non-academic capacity by Duke.[8] Based on data from the most recently filed public documents, the Plan has 7,500 participants and beneficiaries receiving payments from the

---

[8] Excluded from the Plan are individuals classified as independent contractors. *See* Plan Doc, § 1.15. Additionally, certain non-exempt Durham Regional Hospital and Raleigh Community Hospital employees are participants in the Plan. In contrast, certain Commissioned Police Officers, paid biweekly, are not participants in the Plan.

Plan; Duke employs 20,542 active participants as of June 30, 2022. *See* Form 5500 for the Plan (2021).

56.     Under the Plan, participants accrue benefits in the form of an SLA. *See* Plan Doc, § 4.01. A participant's accrued benefit is 1.25% of their average final compensation multiplied by their years of credited service up to 20 years, plus 1.66% of average final compensation multiplied by their years of credited service in excess of 20 years. *Id.*, § 4.01(b).

57.     The normal retirement age under the Plan is 65 (*id.*, § 1.23), but the Plan allows participants to retire early if they are 45 years old and have 15 years or more of credited service. *Id.*, § 4.03. To account for the longer period over which the Plan anticipated to pay the Participant, the Plan reduces an early retiree's benefit depending on their age when benefits begin and the number of years of credited service.

58.     The Plan states that the normal form of benefit for unmarried participants is an SLA; the normal form for married participants is a 50% JSA. *Id.*, § 4.05. The Plan also offers participants optional forms of benefit, including 50%, 75%, and 100% JSAs, a Social Security leveling income option, and a lump sum for Participants with an accrued benefit of up to $10,000. *Id.*, § 4.06. In addition, the Plan offers a Preretirement Survivor Benefit (i.e., a QPSA), which is 50% of the amount payable to a Participant if he had retired and selected a 50% JSA. *Id.*, § 4.07.

59. To convert a participant's accrued benefit into a JSA, the Plan uses a formula based on set conversion factors in Appendix I of the Plan. The chart below shows the conversion factors used by the Plan to determine a participant's monthly:

| Age | 50% JSA | | 100% JSA | |
|---|---|---|---|---|
| | A | B | A | B |
| 55 | .912 | .004 | .839 | .007 |
| 56 | .909 | .004 | .834 | .007 |
| 57 | .906 | .004 | .829 | .007 |
| 58 | .903 | .004 | .824 | .007 |
| 59 | .900 | .005 | .819 | .008 |
| 60 | .896 | .005 | .813 | .008 |
| 61 | .893 | .005 | .808 | .008 |
| 62 | .890 | .005 | .803 | .008 |
| 63 | .887 | .005 | .798 | .009 |
| 64 | .884 | .005 | .793 | .009 |
| 65 | .880 | .006 | .787 | .010 |

60. Effective July 1, 2023, Duke amended the Plan to update the conversion factors in Appendix I. The following shows the new factors in Appendix I:

| Age | 50% JSA | | 100% JSA | |
|---|---|---|---|---|
| | A | B | A | B |

22

| | | | | |
|---|---|---|---|---|
| 55 | .915 | .004 | .844 | .007 |
| 56 | .915 | .004 | .844 | .007 |
| 57 | .915 | .004 | .844 | .007 |
| 58 | .915 | .004 | .844 | .007 |
| 59 | .915 | .004 | .844 | .007 |
| 60 | .915 | .004 | .844 | .007 |
| 61 | .915 | .004 | .844 | .007 |
| 62 | .915 | .004 | .844 | .007 |
| 63 | .915 | .004 | .844 | .007 |
| 64 | .915 | .004 | .844 | .007 |
| 65 | .915 | .004 | .844 | .007 |

61.     The Plan does not state the assumptions upon which the conversion factors in Appendix I are based, but public filings with the Department of Labor state the assumptions are: the 1963 George B. Buck Mortality Table (blended 2/3 female) with a 4.5% interest rate.

**B.**     ***The Plan's Formulas for Determining JSAs and QPSAs Prior to July 1, 2023, Do Not Satisfy ERISA's Actuarial Equivalence Requirements***

62.     As discussed, until July 1, 2023, the Plan used formulas based on unreasonably low conversion factors to determine the amount of participants' JSA and QPSA benefits. These old formulas produce benefits that are not actuarially equivalent to the SLA the Plan offered to participants.

23

63.     The Plan's formulas for calculating JSAs and QPSAs prior to July 1, 2023, did not reflect the economic conditions or the mortality rates of participants when Defendants calculated Plaintiff's and the Class's benefits. Using outdated interest rates and mortality tables is unreasonable and unlawful under ERISA.

**C.     The Formulas Used To Determine Actuarial Equivalence Must Be Reasonable When The Benefits Are Calculated**

**i.     Reasonable Discount Rates**

64.     The Treasury is a reliable source for a "reasonable" discount rate for any given year. The Treasury regularly updates the discount rate, known as the "applicable interest rate." According to the Treasury, pension plans should use discount rates that reflect the actuary's "best estimate," anticipated future events, and economic data as of the measurement date. The "applicable interest rate" is based on corporate bond yields and is updated throughout the year.

65.     The applicable interest rate is a yield curve. Yield curves provide for different rates depending on when future payments are made. The applicable interest rate is based on the first, second, and third Segment Rates. *See* 26 U.S.C. §§ 417(e)(3)(C) and 430(h)(2)(C).  The Segment Rates are determined using yields on corporate bonds with maturities of 0 to 5 years, 5 to 20 years, and beyond 20 years. The Segment Rates are appropriate benchmarks for pension plans because the maturity rates closely correspond to the time period over which a pension plan will pay its retirees. The following shows the IRS Segment Rates over the past five years:

| Year | 417(e) Segment Rates for August | Effective Rate |
|------|--------------------------------|----------------|
| 2022 | 3.79% / 4.62% / 4.69% | 4.36% |
| 2021 | 0.66% / 2.50% / 3.12% | 2.09% |
| 2020 | 0.52% / 2.22% / 3.03% | 1.92% |
| 2019 | 2.09% / 3.00% / 3.61% | 2.90% |
| 2018 | 3.10% / 4.15% / 4.46% | 3.90% |
| 2017 | 1.93% / 3.57% / 4.36% | 3.28% |

66.     Defined benefit plans use the "applicable interest rate" to calculate the present values of lump sum benefits. Section 417(e) of the Tax Code provides that a pension plan can offer a lump sum benefit. However, the present value of the lump sum must be at least equal to the present value calculated using the "applicable mortality table" and "applicable interest rate" (collectively referred to as the "**Treasury Assumptions**"). *See* 26 U.S.C. § 417(e)(3). While a plan can subsidize a lump sum benefit, the applicable interest rate (coupled with the applicable mortality table) sets a "floor" for the present value below which a lump sum cannot go.

67.     Indeed, for providing the relative value of all benefit forms, including JSAs, the applicable interest rate is *per se* reasonable for actuarial equivalence purposes. *See* 26 C.F.R. § 1.417(a)(3)-1 (c)(2)(iv)(B).

### ii.     *Reasonable Mortality Tables*

68.     Mortality tables show the probability of death for a specific group of individuals or population groups. Pension Plans use mortality tables to estimate the probability of a participant dying before they receive another year of benefits. Mortality is a key assumption in determining benefits and liabilities that should represent the "best estimate" of the expected duration of future benefit payments.

25

69.     Mortality tables for pension plans should be updated regularly to reflect changes in life expectancy. Indeed, "plan management should consider the specific demographics of their plan when evaluating the appropriate mortality or other assumptions to use, as well as relevant available mortality data. . . . *[management] should consider any published new mortality data for their plans in relation to their plan-specific mortality experience and future expectations*."[9]

70.     Several organizations publish mortality tables used by pension plans, but the primary source is the SOA. The Retirement Plan Experience Committee ("RPEC") of the SOA publishes the mortality tables upon which many pension plans across the country rely. The SOA bases its mortality tables on "experience studies" that measure the actual mortality experience of pension plan participants in the United States.

71.     These "experience studies" were the basis for the mortality tables published by the SOA in 1971 ("**71 GAM**"), 1976 (the "**UP-84**"), 1983 (the "**1983 GAM**"), 1994 (the "**1994 GAR**"), 2000 (the "**RP-2000**"), 2014 ("**RP-2014**") and 2019 (the "**Pri-2012**"). Periodically, the tables are updated to account for changes in the mortality experience of US workers over the years. The SOA typically publishes new mortality tables or sets of tables several years after the date they are named after. For example, the SOA released the

---

[9] (Emphasis added) PWC, US Pensions Guide, Defined benefit plan financial statements, § 9.4.4, June 30, 2022. Available at: https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/pensions-and-employee-benefitspeb/peb_guide/Chapter-9-PEB/94_Defined_benefit_plan_financial_statements_8.html (last accessed September 6, 2023).

RP-2000 mortality tables in 2000 based on the mortality experience of pension plan participants from 1990–1994.

72. For the past 50 years, the SOA's experience studies show a steady upward trend in life expectancy. Generally, retirees in the last 15 years live longer than retirees in the 1970s and 1980s. A study that the SOA published in 2014 indicated that the RP-2000 mortality tables "no longer reflect the actual mortality experience of pension plan participants and projected trends in that experience."[10] When the SOA released the RP-2014 mortality tables, the managing director for the SOA predicted that the update would increase liabilities for pension plans between 4% and 8%.[11] The increase in liabilities spurred Moody's to conclude that plan sponsors would have to divert $110 billion to their pension plans over seven years to fund additional liabilities.[12] The chart below shows the increase in life expectancy over the last few decades and the corresponding impact on plan liabilities:

---

[10] Mortality Tables for Determining Present Value Under Defined Benefit Pension Plans, 26 C.F.R. 1, 82 FR 46388, 46397.

[11] *See* Society of Actuaries Pledges Faster Mortality Scale Updates, available at: https://www.plansponsor.com/society-of-actuaries-pledges-faster-mortality-scale-updates/ (last accessed May 31, 2023)

[12] *Id.*



*See* Plaintiff's Expert Report, *Rockwell v. Berube*, No. 20-cv-01783, ECF No. 55-5 at 18.

73.     As the graph above demonstrates, a 70-year-old today is expected to live roughly 30% longer than a 70-year-old retiree in the 1980s. It is improper for a pension plan to use formulas based on mortality rates from 50 years ago to calculate a retiree's benefits in 2018 because antiquated mortality assumptions fail to account for the improvements in life expectancy over the past few decades. For example, the 71 GAM was released in 1971. Data collected from 1964–1968, now ***over 50 years old***, form the basis of the 71 GAM. In the last 50 years, there have been substantial improvements in lifestyle habits and healthcare, which lowered the mortality rates of pensioners. The 71 GAM, like other outdated mortality tables, does not account for these improvements.

28

74.     A benchmark for reasonable mortality rates is the mortality assumption released by the Treasury. The Treasury releases the "applicable mortality table" based on the most up-to-date SOA tables. When prescribing the applicable mortality tables, the Secretary must consider the "results of available independent studies of mortality of individuals covered by pension plans." *Id.* In other words, the IRS defers to the SOA when it comes to the mortality rates of pensioners.

75.     Plan sponsors must make minimum contributions to their pension plans, and the Treasury prescribes the tables that plans should use. For plan years beginning on or after January 1, 2023, the Treasury regulations prescribe the use of mortality tables based on the Pri-2012 Report,[13] which is based on RPEC's experience study for the period 2005–2014 and is the best available study of the actual mortality experience of participants.[14] The "applicable mortality table" must be updated (at least every ten years, but, in practice, the Treasury updates the rates more frequently) and "must be based on the actual experience of pension plans . . . ." 26 USC § 430(h)(3)(A).

76.     For measuring pension plan liabilities, plan sponsors can apply to use plan-specific mortality tables that more accurately reflect the experience of a given plan's participants. *See* 26 U.S.C. § 430(h)(3)(C). If a plan has enough participants and has been around long enough, it can apply to the IRS to use company-specific mortality tables based

---

[13] *See* IRS Notice 2022-22; *see also* 87 FR 25161, 25163.

[14] *See* 87 FR 25161, 25163.

on the experience of the plan's participants to determine present values under § 430. Similarly, plans can use separate mortality tables for disabled participants because disabled participants generally have different mortality rates from healthy pensioners. *See* 26 U.S.C. § 430(h)(3)(D). Like the plan-specific tables, mortality tables used for disabled participants must be periodically updated. Through its regulatory guidance, the Treasury believes it is important to regularly update mortality tables used by pension plans to ensure that they are accurate and reflect the latest mortality trends.

77.     The Treasury Assumptions, including the applicable mortality table, are considered *per se* reasonable for determining the present values of different benefit forms. *See* 26 C.F.R. § 1.417(a)(3)-1 (c)(2)(iv)(B).

> **D.     The Plan's Formulas for Calculating QJSAs and QPSAs Prior to July 1, 2023, Do Not Satisfy ERISA**

78.     Until Duke recently amended the Plan in May 2023, the Plan used formulas based on unreasonably low conversion factors to determine JSA and QPSA benefits for participants.

79.     Using these formulas to calculate benefits was unreasonable because the discount rates did not reflect the economic conditions on participants' measurement dates (i.e., the dates Defendants determined their benefits). Similarly, the mortality table did not reflect the experience of participants or pensioners in general, let alone future "anticipated events" (i.e., the anticipated mortality rates of pensioners).

80.     Effective July 1, 2023, the Plan amended the formulas. At some point prior to May 17, 2023 — the date Duke's Vice President executed Amendment 2023-8 to the

30

Plan — Defendants realized that the Plan's formulas were outdated and not producing actuarially equivalent benefits. As a result, Duke updated the Plan to use reasonable formulas. However, Amendment 2023-8 applied to benefits calculated only on or after July 1, 2023. Participants whose benefits were calculated before July 1, 2023, have no recourse. Instead, they must continue receiving benefits produced by outdated and unreasonable formulas that are not actuarially equivalent to the SLA Defendants offered them for the rest of their lives, in violation of ERISA's actuarial equivalence requirements.

81.     Duke could have made Amendment 2023-8 retroactive and recalculated the benefits of those participants who began collecting before July 1, 2023, but it chose not to. Duke could have applied a "greater of" provision to ensure that no participant who began receiving benefits before July 1, 2023, would be worse off, but it chose not to. As a result, a participant who began receiving benefits on June 1, 2023, would receive considerably lower benefits than a similarly situated employee who began receiving benefits on July 1, 2023. Discovery will reveal whether Duke notified participants beforehand about its intent to change the formulas used to calculate their benefits and the impact it could have had on them.

82.     The conversion factors produced by the Plan's formulas for determining JSAs and QPSAs are unreasonably low compared to those produced using reasonable assumptions like the Treasury Assumptions. The following chart compares the conversion factors for a 65-year-old participant with a 65-year-old spouse on June 1, 2023, using the Plan's old formulas, and on July 1, 2023, using the Plan's updated formulas:

31

| Benefit Form | The Plan's <u>Old</u> Conversion Factors (June 1, 2023) | Monthly Amount Using the <u>Old</u> Conversion Factors (June 1, 2023) | The Plan's <u>New</u> Conversion Factors (July 1, 2023) | Monthly Amount Using the <u>New</u> Conversion Factors (July 1, 2023) | Percent Difference in Benefit Amount |
|---|---|---|---|---|---|
| SLA | N/A | $1,000.00 | N/A | $1,000.00 | N/A |
| 50% JSA | 0.880 | $880.00 | 0.915 | $915.00 | **3.9%** |
| 100% JSA | 0.787 | $787.00 | 0.844 | $844.00 | **7.2%** |

83. Similarly, the Plan's old formulas produce lower benefits when compared to the conversion factors produced by the applicable Treasury Assumptions. The following chart compares the conversion factors for Plaintiff, using the Plan's old formulas, and the conversion factors produced by the Applicable Interest Rate and Mortality Table, as defined by the Plan, on the date Plaintiff began receiving benefits:

| Year | Benefit Form | The Plan's Conversion Factors | Monthly Amount Using Conversion Factors Produced by Plan Formula | Conversion Factors Produced Using Applicable Treasury Assumptions | Monthly Amount Using the Treasury Conversion Factors | Percent Difference in Benefit Amount |
|---|---|---|---|---|---|---|
| | SLA | N/A | $1,000.00 | N/A | $1,000.00 | N/A |
| | 50% JSA | 0.8680 | $868.00 | 0.8989 | $898.90 | **3.6%** |
| 2018 | 100% JSA | 0.7670 | $767.00 | 0.8163 | $816.30 | **6.4%** |

32

84.     The charts above demonstrate that Defendants' use of unreasonable and unlawful assumptions results in a substantial difference in monthly income for participants who began receiving benefits before July 1, 2023.

85.     Plaintiff Franklin began collecting benefits under the Plan on March 1, 2018. She accrued, and Defendants offered her an SLA that would have paid her $2,081.78 monthly. She selected the 50% JSA, which pays $1,806.99 monthly. If Defendants used the Applicable Interest Rate and Applicable Mortality table — as defined in the Plan — to calculate her benefits instead of the Plan's formulas for calculating benefits, Plaintiff's benefit would be approximately $1,871.31 or $64.32 more per month. By using outdated formulas, likely based on outdated actuarial assumptions that produce unreasonably low conversion factors, instead of reasonable, current actuarial assumptions like the Applicable Interest Rate and Applicable Mortality table, as defined in the Plan, Defendants reduced the present value of Plaintiff Franklin's benefits by approximately $10,309 (past damages of $4,309.44 and future damages of $5,999.56).

86.     Defendants updated the formulas to calculate QJSA and QPSA benefits effective July 1, 2023. The formulas now use higher conversion factors, which are closer to the conversion factors produced by the § 417(e) Treasury Assumptions and result in higher monthly payments to participants. Updating the Plan's formulas to calculate QJSAs and QPSAs indicates Defendants' recognition that the old formulas failed to produce actuarially equivalent benefits. By choosing not to apply the new formulas retroactively,

33

Defendants have left participants who started receiving benefits before July 1, 2023, with benefits that fall short of ERISA's requirements. This leaves these participants and their beneficiaries with lower benefits than they should receive for the rest of their lives.

87. Defendants' use of formulas that produce unreasonably low conversion factors, likely based on outdated actuarial assumptions, throughout the relevant time period has caused the benefits paid to participants who receive JSAs and QPSAs to be not actuarially equivalent, in violation of ERISA §§ 205(d) and 203(a), 29 U.S.C. §§ 1055(d) and 1053(a). Instead of receiving the benefits to which they are entitled, Plaintiff and the Class have been and continue to receive benefits that are lower than they should be.

## VI. CLASS ACTION ALLEGATIONS

88. Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the following Class (the "Class"):

> All Participants and Beneficiaries of the Plan who (1) began receiving benefits on or after six (6) years prior to the date this Complaint is filed but before July 1, 2023, (2) are receiving a JSA with a survivor benefit of at least 50% and no more than 100% of the benefit paid during the retiree's life, or are receiving a QPSA, and (3) are receiving a benefit where the actuarial present value of their annuity as of the date benefits began was less than the actuarial present value of their age-65 SLA using the Applicable Interest Rate and Applicable Mortality Tables, as defined in the Plan, as of the date benefits began. Excluded from the Class are Defendants and any individuals subsequently determined to be fiduciaries of the Plan.

89. The Class members are so numerous that joinder of all members is impractical. The Class includes hundreds of individuals. Based on government filings, as of July 1, 2021, 7,500 Participants and Beneficiaries were receiving benefits under the Plan.

90. Plaintiff's claims are typical of the claims of the members of the Class because they arise out of the same policies and practices as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct. Plaintiff and all Class Members seek identical remedies under identical legal theories, and Plaintiff's claims do not conflict with the interests of any other Class members in that the Plaintiff and the other Class members were subject to the same conduct and suffered the same harm.

91. There are questions of law and fact common to the Class, which predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A. Whether the formulas used to determine the value of participants' JSAs and QPSAs before July 1, 2023, are unreasonable;

B. Whether the formulas used to determine the value of participants' JSAs and QPSAs before July 1, 2023, violate the actuarial equivalence requirements of ERISA;

C. Which formulas would produce a reasonable conversion factor to apply to Plaintiff and Class Members' SLA;

D. Which formulas would produce a reasonable conversion factor to apply to Plaintiff and Class Members' SLA to satisfy ERISA's actuarial equivalence requirements;

E. Whether the formulas used by the Plan to calculate participants' benefits caused harm to Plaintiff and Class Members;

35

F. Whether the Board violated its fiduciary duties of loyalty and prudence under ERISA;

G. Whether Duke should be required to recalculate JSA and QPSA benefits before July 1, 2023, for Plaintiffs and Class Members based on reasonable formulas; and

H. Whether Plaintiff and the Class should receive additional benefits.

92.     Plaintiff will fairly and adequately represent the Class because she has no interests antagonistic to those of other Class members, and the adjudication of her claims will necessarily decide the identical issues for all other Class Members. Plaintiff is committed to the vigorous prosecution of this action.

93.     Plaintiff has retained counsel competent and experienced in ERISA and class action litigation.

94.     Plaintiff does not anticipate any difficulty in management of this matter as a class action.

95.     The requirements of Rule 23(b)(1)(A) are satisfied because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

96.     The requirements of Rule 23(b)(1)(B) are satisfied because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

97. Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

98. Individual Class Members do not have an interest in controlling the prosecution of these claims in individual actions rather than a class action because the equitable relief sought by any Class Member will either inure to the benefit of the Plan or affect each Class Member equally.

99. If the Class is not certified under Rule 23(b)(1) or (b)(2), then certification under (b)(3) is appropriate because the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members. A class action is superior to other available methods for the fair and efficient adjudication of the controversy because the damages suffered by each individual Class Member are relatively modest compared to the expense and burden of individual litigation. It would be impracticable for each Class Member to seek redress individually for the wrongful conduct alleged herein. There will be no difficulty in the management of this litigation as a class action as the legal issues affect standardized conduct by Defendants, and class actions are commonly used in such circumstances. Furthermore, since joinder of all members is impracticable, a class action will allow for an orderly and expeditious administration of the claims of the Class. It will foster economies of time, effort, and expense.

37

# VII.    CAUSES OF ACTION

## COUNT I: VIOLATION OF ERISA'S JSA
## ACTUARIAL EQUIVALENCE REQUIREMENT
## (ERISA § 205, 29 U.S.C. § 1055)

100.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

101.    The Plan improperly reduced JSA and QPSA benefits for participants who began receiving benefits before July 1, 2023, below what they would receive if those benefits satisfied ERISA's actuarial equivalence requirements.

102.    ERISA § 205(d), 29 U.S.C. § 1055(d) requires plans to provide QJSAs that are "the actuarial equivalent of a single annuity for the life of the participant." Similarly, the applicable Treasury regulations state that plans must provide QJSAs that are "at least the actuarial equivalent of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan . . . determined, on the basis of consistently applied **_reasonable actuarial factors_**[.]" 26 CFR § 1.401(a)-11(b)(2) (emphasis added).

103.    Because the Plan used outdated, unreasonable formulas to calculate JSA and QPSA benefits before July 1, 2023, those benefits are not actuarially equivalent to the SLA Defendants offered to participants.

104.    Defendants' use of unreasonable formulas to calculate these benefits is a violation of ERISA § 205(d), 29 U.S.C. §1055(d).

105.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any

38

provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

106. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a participant or beneficiary to bring a civil action "for appropriate relief under section 1109 of this title."[15]

107. Pursuant to ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3), Plaintiff seeks all available and appropriate remedies to redress violations of ERISA's actuarial equivalence requirements outlined in § 1055(d), including but not limited to the relief set forth below in the Prayer for Relief.

### COUNT II: VIOLATION OF ERISA'S ANTI-FORFEITURE RULES
### (ERISA § 203, 29 U.S.C. § 1053)

108. Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

109. The Plan used outdated formulas based on unreasonably low conversion factors, which produced monthly benefits for participants who began receiving JSAs and QPSAs before July 1, 2023, that are less than the actuarial equivalent of their SLA at

---

[15] 29 U.S.C. § 1109(a) states: "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."

Normal Retirement Age, causing an illegal forfeiture of benefits in violation of ERISA § 203(a), 29 U.S.C. § 1053(a).

110. Section § 203(a) of ERISA, 29 U.S.C. § 1053(a) establishes "an employee's right to his normal retirement benefit is nonforfeitable [.]" The applicable Treasury regulation states that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable." 26 C.F.R. § 1.411(a)-4(a).

111. By using outdated formulas, likely based on data that is 50 years old, Defendants underestimated the value of the benefits that participants accrued, resulting in benefits that were not actuarially equivalent to Participants' age-65 SLA and, therefore, are causing an impermissible forfeiture.

112. Defendants' use of unreasonable actuarial assumptions as set forth herein violated § 203, 29 U.S.C. § 1053.

113. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

114. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a participant or beneficiary to bring a civil action "for appropriate relief under section 1109 of this title."

115. Pursuant to ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3), Plaintiff seeks all available and appropriate remedies to redress violations of

40

ERISA's non-forfeitability requirements outlined in § 203(a), 29 U.S.C. § 1053(a), including but not limited to the relief in the Prayer for Relief.

## COUNT III: BREACHES OF FIDUCIARY DUTY
### (ERISA § 404, 29 U.S.C. § 1104)

116.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

117.    During all relevant times, the Board was an acting fiduciary of the Plan and was responsible for paying benefits in accordance with ERISA's requirements and the Plan's terms, unless those Plan terms themselves violated ERISA.

118.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), imposes several fiduciary duties on Plan Administrators, including the duty to act loyally and "solely in the interest of the participants and beneficiaries[,]" the duty to act with "care, skill, prudence, and diligence" — which includes ensuring that benefits paid pursuant to a defined benefit plan conform with ERISA's statutory requirements — and the duty to act "in accordance with the documents and instruments governing the plan *insofar as such documents and instruments are consistent with* the provisions of" subchapters I and III of ERISA. 29 U.S.C. § 1104(a)(1) (emphasis added).

119.    Here, the Board and its members are fiduciaries for the Plan because they exercise discretionary authority or discretionary control respecting the management of the Plan as well as authority and control over the disposition of the Plan's assets. *See* ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). They had authority or control over the amount and payment of JSAs and QPSAs paid from Plan assets.

41

120.    The Board breached these fiduciary duties by administering a Plan that did not conform with ERISA's actuarial equivalence requirements. The Board acted disloyally by causing Plaintiff and the Class to receive benefits that were not actuarially equivalent to their SLAs at Normal Retirement Age, thereby enabling Duke, as Plan Sponsor, to retain additional money by reducing the minimum amount it was required to contribute to the Plan.

121.    The Board's breaches, as set forth herein, caused participants to forfeit a portion of the accrued benefit.

122.    ERISA requires fiduciaries who appoint other fiduciaries to monitor their actions to ensure they comply with ERISA. Duke, therefore, had a fiduciary duty to monitor the actions of the Board to ensure it complied with ERISA.

123.    Duke breached its fiduciary duties to supervise and monitor the Board by allowing them to pay benefits that were not actuarially equivalent, which is a violation of ERISA.

124.    Here, Duke was a fiduciary for the Plan because it was a named fiduciary under the Plan and exercised discretionary authority or discretionary control respecting the management of the Plan as well as authority and control over the disposition of the Plan's assets. *See* ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Duke had authority or control over the amount and payment of JSAs and QPSAs from Plan assets.

125.    Duke also failed to act prudently and diligently by failing to sufficiently review the terms of the Plan, including the formulas used to calculate JSA and QPSA

42

benefits before July 1, 2023, which caused Plaintiff and the Class to receive less than the full value of their ERISA-protected accrued benefit. Duke's breaches caused participants to forfeit a portion of the accrued benefit.

126. As a direct and proximate result of these fiduciary breaches, Class members lost millions of dollars in vested accrued pension benefits.

127. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a participant or beneficiary to bring a civil action "for appropriate relief under section 1109 of this title."

128. Pursuant to ERISA § 502(a)(2) and § 409(a), 29 U.S.C. § 1132(a)(2) and § 1109(a), Plaintiff, on behalf of the Plan, seeks all available and appropriate remedies against the Board and Duke to redress and make good to the Plan all losses caused by their violations of ERISA, including but not limited to the relief to the Plan requested in the Prayer for Relief.

129. ERISA § 502(a)(3), 29 U.S.C.§ 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

130. Plaintiff seeks all available and appropriate remedies to redress violations of ERISA's fiduciary duties outlined in § 404(a)(1), 29 U.S.C. § 1104(a)(1), including but not limited to the relief set forth below in the Prayer for Relief.

# VIII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays that the Court enter judgment against Defendants on all claims and requests that the Court awards the following relief:

A.  An Order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as Class representative, and appointing the undersigned to act as Class Counsel;

B.  A declaratory judgment that the formulas used by the Plan for determining JSA and QPSA benefits before July 1, 2023, violated ERISA's actuarial equivalence requirements outlined in § 205(d), 29 U.S.C. § 1055(d).

C.  A declaratory judgment that the formulas used by the Plan for determining JSA and QPSA benefits before July 1, 2023, violated ERISA's anti-forfeiture provision at § 203(a), 29 U.S.C. § 1053(a);

D.  A declaratory judgment that the Board breached its fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1104 for, *inter alia*, following Plan terms that violated ERISA and for failing to pay benefits to Participants in conformance with ERISA's actuarial equivalence and anti-forfeiture requirements outlined in §§ 205(d) and 203(a), 29 U.S.C.§§ 1055(d) and 1053(a);

E.  A declaratory judgment that Duke breached its fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1104 for, *inter alia*, following Plan terms that violated ERISA and for failing to pay benefits to Participants in conformance

44

with ERISA's actuarial equivalence and anti-forfeiture requirements outlined in §§ 205(d) and 203(a), 29 U.S.C. §§ 1055(d) and 1053(a);

F.  An Order requiring Defendants to provide an accounting of all prior payments of benefits to the Class under the Plan for which Defendants used the outdated and unreasonable formulas discussed herein to determine JSAs and QPSAs before July 1, 2023, and provide information to recalculate those payments to Class members in compliance with ERISA §§ 205(d) and 203(a), 29 U.S.C. §§ 1055(d) and 1053(a);

G.  Declaratory and injunctive relief as necessary and appropriate, including enjoining Defendants from further violating the duties, responsibilities, and obligations imposed on them by ERISA with respect to the Plan and ordering Defendants to pay future benefits to participants who began receiving JSA and QPSA benefits before July 1, 2023, in accordance with ERISA §§ 205(d) and 203(a), 29 U.S.C. §§ 1055(d) and 1053(a);

H.  Disgorgement of any benefits or profits Defendants received or enjoyed due to the violations of ERISA §§ 205(d) and 203(a), 29 U.S.C. §§ 1055(d) and 1053(a);

I.  Restitution of all amounts Defendants kept in the Plan but were obliged to pay to Plaintiff and other Class Members in accordance with ERISA §§ 205(d) and 203(a), 29 U.S.C. §§ 1055(d) and 1053(a);

J.    Surcharge from Defendants totaling the amounts owed to participants or the amount of unjust enrichment obtained by Defendants as a result of the violations of ERISA §§ 205(d) and 203(a), 29 U.S.C. §§ 1055(d) and 1053(a);

K.    Relief to the Plan from the Board and Duke for their violations of ERISA § 404, 29 U.S.C. § 1104, including a declaration that the Plan's formulas for determining JSAs and QPSAs before July 1, 2023, violated ERISA §§ 205(d) and 203(a), 29 U.S.C. §§ 1055(d) and 1053(a); restoration of losses to the Plan and its Participants caused by the Board and Duke's fiduciary violations; disgorgement of any benefits and profits Duke received or enjoyed from the use of the Plan's assets or violations of ERISA; surcharge; payment to the Plan of the amounts owed to Class Members caused by fiduciary breach so that those amounts owed can be provided to Plan participants; and all appropriate injunctive relief, such as an order requiring Duke to pay all Participants fully ERISA-compliant benefits in the future and to ensure that all benefits it pays to Participants conform to the requirements outlined in ERISA §§ 205(d) and 203(a), 29 U.S.C. §§ 1055(d) and 1053(a);

L.    An award of pre-judgment interest on any amounts awarded to Plaintiff and the Class pursuant to law;

46

M.   An award of Plaintiff's attorneys' fees, expenses, and taxable costs, as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), or other applicable doctrine; and

N.   Any other relief the Court determines is just and proper.

**SIRI & GLIMSTAD LLP**

/s/*Dana Smith*
Dana Smith (NC Bar No. 51015)
525 North Tryon Street
Suite 1600, #7433
Charlotte, North Carolina 28202
Tel: (980) 448-1299
Lisa R. Considine (Notice of Special
Appearance to be filed)
Oren Faircloth (Notice of Special
Appearance to be filed)
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: dsmith@sirillp.com
E: lconsidine@sirillp.com
E: ofaircloth@sirillp.com

*Attorneys for Plaintiff*

47