IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| Joy G. Franklin, on behalf of herself and all others similarly situated,<br><br>  Plaintiff,<br><br>v.<br><br>Duke University, the Retirement Board for Duke University, and John/Jane Does 1-10,<br><br>  Defendants. | Case No. 1:23-cv-00833-CCE-JLW |

**DECLARATION OF OREN FAIRCLOTH IN SUPPORT OF PLAINTIFF'S
UNOPPOSED MOTION FOR
<u>FINAL APPROVAL OF CLASS ACTION SETTLEMENT</u>**

I, Oren Faircloth, declare as follows:

**Personal and Law Firm Background**

1. I am a Class Action attorney at Siri & Glimstad LLP ("SG"). SG serves as counsel for Plaintiff Joy G. Franklin and the proposed Settlement Class in this action. SG has prosecuted this litigation on behalf of Plaintiff since its inception. I have been actively involved in the prosecution of this Action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based on my participation in and active supervision of all material aspects of the Action. I submit this declaration in support of Plaintiff's Unopposed Motion for Final Approval of Class Action Settlement.

2. I am a member in good standing of the bar of Connecticut, and I am presently practicing before the Court on Special Appearance with Ms. Dana Smith, who remains responsible to this Court for the conduct of the litigation. My business address is Siri & Glimstad LLP, 745 Fifth Avenue, Suite 500, New York, NY 10151, and my email is ofaircloth@sirillp.com.

3. I have personally been involved in every stage of this litigation, including pre-suit investigation, review of the Plan's governing documents and actuarial assumptions, analysis of benefit-calculation methodology, development of Plaintiff's legal theories, coordination with experts, analysis of class-wide damages, briefing of motions to dismiss, briefing before the Fourth Circuit, mediation sessions, and negotiation and finalization of the Settlement Agreement.

4. Based on this experience, and my personal involvement in this Action from its inception, I am fully familiar with the factual record, the litigation posture, the damages

1

analyses, and the basis and terms of the proposed Settlement. The statements set forth herein are based on my personal knowledge or on information obtained in the course of my representation of Plaintiff and the Settlement Class. If called upon to testify, I could and would testify competently thereto.

5. A true and accurate copy of **SG's Firm Resume – Class Action Group** is attached as **Exhibit A**.

6. A true and accurate copy of the **Declaration of Kevin Flynn** from Angeion, as well as the accompanying attachment, is attached as **Exhibit B**. A true and accurate copy of the **Final Letter** approving the Settlement from the Independent Fiduciary**,** Gallagher Fiduciary Advisors, LLC, is attached as **Exhibit C.**

I. **Summary of Claims**

7. Plaintiff is a participant in the Employees' Retirement Plan of Duke University (the "Plan"). She filed this proposed class action on behalf of participants and beneficiaries who received joint and survivor annuities ("JSAs") and qualified preretirement survivor annuities ("QPSAs"). The case concerns whether JSAs paid by the Plan are at least "actuarially equivalent" to the single life annuities ("SLAs") that participants could have elected at benefit commencement, as required by ERISA § 205(d), 29 U.S.C. § 1055(d). Plaintiff alleges that, as administered, the Plan pays retirees less than actuarially equivalent amounts. *See* Compl., Dkt. 1, ¶¶ 14–16; Plaintiff's Memorandum in Support of Preliminary Approval ("Pl.'s Mot."), Factual Background. Dkt. 52, at 3–4.

8. Plaintiff alleges that Defendants calculated JSA (and QPSA) benefits using outdated and unreasonable mortality and interest assumptions, thereby converting SLAs to

2

JSAs at factors that systematically reduced Class Members' monthly benefits below actuarily equivalent levels. Compl., ¶ 87. Had Defendants used assumptions reflecting conditions at the time benefits commenced, the present values of the JSA and SLA options would have been equal, as ERISA requires. *See id.*, 85; Pl.'s Mot. (Factual Background).

9. The Complaint asserted three ERISA causes of action: (i) violation of ERISA § 205 for failure to provide actuarily equivalent JSAs; (ii) violation of ERISA's anti-forfeiture provisions, 29 U.S.C. § 1053, for reducing vested benefits through unreasonably low conversion factors; and (iii) breach of fiduciary duty under ERISA §§ 404 and 502(a) for administering the Plan in a manner that failed to conform to the statute's actuarial-equivalence and anti-forfeiture requirements. Defendants deny the allegations and any wrongdoing. *See* Compl., ¶¶ 100–130; Pl.'s Mot. (Factual Background).

## II. Litigation History and Mediation

10. On September 29, 2023, Plaintiff filed the Complaint initiating this action on behalf of herself and similarly situated participants in the Plan. Prior to filing the Complaint, counsel for Plaintiff reached out to Duke University to request the governing Plan documents on Plaintiff's behalf. Duke University provided copies of the Plan documents and Summary Plan Descriptions in effect during the relevant time period. Plaintiff's counsel reviewed hundreds of pages of Plan materials in evaluating and framing the claims asserted in this action.

11. On December 8, 2023, Defendants moved to dismiss (including on standing grounds) and to compel arbitration. *See* Dkts. 15, 16. On February 29, 2024, the District Court denied Defendants' motion as to Plaintiff's ERISA § 502(a)(2) claims for lack of

subject-matter jurisdiction and denied Defendants' motion to compel arbitration of the § 502(a)(3) claims. Dkt. 29.

12. On March 7, 2024, Defendants filed a Notice of Appeal challenging the denial of their motion to compel arbitration. *See* Dkt. 30. On April 23, 2024, after full briefing, the District Court stayed litigation on Plaintiff's § 502(a)(3) claims pending the arbitrability appeal but expressly allowed discovery and proceedings to continue on Plaintiff's § 502(a)(2) claims. *See* Dkts. 40, 41. In turn, Defendants moved the Court of Appeals for the Fourth Circuit to stay the district court proceedings, which the Fourth Circuit granted on June 3, 2024. *See* Dkt. 45; No. 24-1205, Entry No. 24.

13. On May 28, 2024, the District Court notified the Parties of the decision in *Canteen v. Charlotte Metro Credit Union*, 900 S.E.2d 890 (N.C. 2024), noting "it is likely to be relevant" to the Parties' appeal and inviting the Parties to reconsider its decision denying the motion to compel arbitration. *See* Dkt. 44.

14. Thereafter, the Parties fully briefed the appeal before the Fourth Circuit, including issues of arbitrability and jurisdiction. *See*, No. 24-1205, Entry Nos. 26, 32, 33. After Defendants filed their appellate brief, in July 2024, counsel for Defendants reached out to discuss the scope of damages and the possibility of an early resolution. The Parties began discussing mediation.

15. On September 9, 2024, the Fourth Circuit tentatively scheduled oral argument for January 28–31, 2025. Entry No. 47.

16. In November 2024, Defendants provided, through counsel, comprehensive data reflecting participant-by-participant pension benefits necessary to evaluate potential

4

class-wide damages. I engaged an experienced actuarial expert to review and analyze this information. The expert's task was to apply actuarial methods to quantify damages on both an individual and aggregate basis, estimate restitution owed to affected participants, and provide a framework for allocating any class-wide recovery. Based on the expert analysis, the Settlement secures approximately one-fifth of the total class-wide damages or roughly 17%. This analysis formed the foundation for subsequent settlement discussions and allowed the Parties to meaningfully assess the policies at issue, the scope of the affected population of participants, and the amounts due and owing to each Class Member. During this time, the Parties reached out to offices of Robert A. Meyer, Esq. at JAMS, an experienced neutral in ERISA and complex class matters.

17. I have personally participated in several mediations with Mr. Meyer and have consistently found him to be highly skilled in resolving complex disputes. In addition, I have spoken with numerous experienced ERISA class action attorneys, all of whom have unanimously emphasized that Mr. Meyer is among the very best mediators in the country for complex financial disputes, including actuarial equivalence cases under ERISA. Based on both my direct experience and the reputation he holds among the ERISA bar, I can attest that Mr. Meyer is one of the most experienced and well-respected mediators in this field.

18. On January 9, 2025, the parties participated in a full-day, arm's-length mediation before Mr. Meyer. The negotiations were hard-fought, fully informed by independent analyses of the Parties' claims and defenses, and conducted without collusion or improper influence of any kind. Ultimately, the parties reached an agreement in principle.

19. After the Parties reached an agreement in principle, they jointly notified the Fourth Circuit and requested that the appeal be held in abeyance to permit them to finalize the terms of the Settlement Agreement. The Fourth Circuit granted that request on January 15, 2025. *See* Entry No. 61. Since that time, counsel for the Parties has engaged in several months of continued negotiations to refine and finalize the Settlement Agreement, which the Parties executed on September 9, 2025, a copy of which was filed with Plaintiff's preliminary approval motion, Dkt. 55-4 ("SA").

### III. Terms of the Settlement

20. The Settlement Class is a non–opt-out class under Rule 23(b)(1) defined as: "All participants and beneficiaries of the Employees' Retirement Plan of Duke University who (1) began receiving benefits on or after September 29, 2017 but before July 1, 2023, and (2) are receiving a joint and survivor annuity with a spousal survivor benefit of at least 50% and no more than 100% of the benefit paid during the retiree's life, or are receiving a qualified preretirement survivor annuity." Excluded from the Class are Defendants and any individuals determined to be fiduciaries of the Plan. *See* SA, § 2.6.

21. Plan records identify approximately 724 Class Members.

22. The Settlement provides a Gross Settlement Amount of $2,350,000, to be allocated *pro rata* among Class Members via increases to monthly pension benefits pursuant to a Plan amendment. *Id.*, §§ 2.21 (defining "Gross Settlement Amount"), § 5.1 (discussing amendment), § 5.2 (calculating monthly benefit adjustment). The Plan will be amended within 60 days after the Court enters a Final Approval Order to provide that each Class Member is entitled to an increased monthly benefit, with allocation in proportion to

6

the value of each Class Member's past and future pension payments. *Id.*, §§ 5.1 and 5.2.

23. Class Member increases are determined by a uniform formula tied to each member's damages as of September 1, 2025, using § 417(e) assumptions (February lookback; annual stability period):

a. Calculate damages (individual and total class) as of 9/1/2025. (SA § 5.2.1.);

b. Individual Percentage Share of Damages, which is the individual damages divided by the total class damages. (SA § 5.2.2.);

c. Individual Share of Net Settlement Amount, which is the Net Settlement Amount multiplied by the Individual Percentage Share. (SA § 5.2.3.);

d. Monthly Benefit Adjustment, which is the Individual Share divided by a monthly annuity factor reflecting the member's benefit form (and, if applicable, surviving beneficiary) as of 9/1/2025, using the same § 417(e) assumptions used in the damages calculation. (SA § 5.2.4.)

Preliminary individualized calculations were filed, Dkt. 55-5, and will be updated post-approval to reflect the final Net Settlement Amount. In short, under the Settlement, the proceeds will be allocated to Class Members proportionally, based on the amount of their claimed losses in accordance with Plaintiff's theory of damages. Class Members will receive payment through an increase to the monthly benefit amounts they are currently receiving. No Class Member's existing benefits will be reduced. For deceased Class Members who are not receiving a Plan benefit, their share of the Settlement proceeds will be paid to their estate in the form of a lump-sum distribution. *See* SA § 5.4. The Settlement is thus carefully structured to treat all Class Members equitably, ensuring that each

participant's recovery reflects their individual damages under Plaintiffs' theory of the case.

24. Class Members will begin receiving their increased benefits on the first day of the first calendar month at least 120 days after the Settlement Effective Date (the "Benefit Increase Payment Date"). SA, § 5.3. Within 7 days after the Effective Date, Plaintiff's actuary will provide Defendants with the final individualized calculations; Defendants will have 10 days to review and raise any good-faith objections. *Id.*, § 5.2.5.

25. Within 60 days after Final Approval, Defendants will adopt a Plan amendment implementing the increased monthly benefits and allocating the Net Settlement Amount (i.e., the $2,350,000 Gross Settlement Amount less Court-approved attorneys' fees, costs/expenses, any Service Award, and Administrative Expenses) among Class Members in proportion to the value of their past and future benefits.

26. As of the Settlement Effective Date, the Plan and all Class Members (and their respective heirs, beneficiaries, executors, administrators, estates, predecessors, successors, and assigns) will fully and finally release all Released Claims against the Released Parties, whether or not they receive a monetary benefit or submit an objection. SA, § 7.1. Upon Final Approval, the Action and all Released Claims will be dismissed with prejudice. *Id.*, § 7.5.

27. The Released Claims do not cover claims for individual benefits under the written terms of the Plan, unrelated to the facts alleged in the Complaint. *See id.*, § 2.33. This release is appropriately tailored to release only the claims brought in this suit, and those claims that arise out of or relate to the allegations in the Complaint and does not release unrelated claims. *Id.*

28. The Settlement Agreement allows Class Counsel to seek attorneys' fees and costs not to exceed roughly one-third of the Gross Settlement Amount, or $775,500, all subject to Court approval. *Id.*, § 6.1.

29. Class Counsel is also permitted to seek a Service Award of up to $5,000 in recognition of her efforts on behalf of the Class. *Id.*, § 6.4. The Settlement is not conditioned on the Court's approval of any fee, cost, or Service Award request, and Defendants retain the right to object. *See id.*

### IV. Motion for Preliminary Approval and the Court's Order

30. On September 27, 2025, Plaintiff, through Class Counsel, filed an Unopposed Motion for Preliminary Approval of Class Action Settlement together with supporting materials, including the executed Class Action Settlement Agreement, proposed notices, and the proposed Preliminary Approval Order. The motion requested that the Court preliminarily approve the Settlement, certify the Settlement Class under Rule 23(b)(1) for settlement purposes, appoint Plaintiff as Class Representative, appoint SG as Class Counsel, and approve the notice procedures.

31. On October 14, 2025, the Court issued its Order Preliminarily Approving Class Action Settlement, Approving Notice Procedures, and Scheduling Fairness Hearing ("Preliminary Approval Order"). Dkt. 58. The Court approved the form and content of the Settlement Notice, finding that the notice plan constitutes "the best notice practicable under the circumstances," complies with Rule 23 and due-process requirements, and provides all information Class Members need regarding the Settlement and their rights. The Court also the Court scheduled the Fairness Hearing for January 21, 2026. Dkt. 59.

32. On October 24, 2025, Defendants caused CAFA Notice to be sent to the appropriate state and federal officials, as required by 28 U.S.C. § 1715.

## V. Notice

33. I have overseen and coordinated with Angeion Group ("Angeion"), the Settlement Administrator, throughout the notice and administration process. The statements in this section are based on my personal knowledge, review of Angeion's work, and communications with Angeion personnel, including Kevin Flynn.

34. On October 17, 2025, Defendants' counsel provided Angeion with the initial Class Data file. That file contained 724 individual records with names and last-known mailing addresses for individuals identified as potential Settlement Class Members.

35. Angeion reviewed the data, conducted duplicate suppression, and compiled the official Class List, which also consisted of 724 unique Settlement Class Member records with valid mailing addresses. Before mailing the notices, Angeion processed the Class List through the U.S. Postal Service's National Change of Address database to update addresses and ensure deliverability.

36. On November 4, 2025, Angeion mailed 724 copies of the Court-approved postcard notice via first-class U.S. mail. As of December 1, 2025, the U.S. Postal Service reported five (5) notices returned as undeliverable. Angeion performed skip-tracing on all returned notices and re-mailed them to any updated addresses located. Following these steps, a total of 721 notices were successfully delivered, resulting in a delivery rate of 99.56%.

37. In addition to direct mail notice, Angeion established and maintains a

10

Case 1:23-cv-00833-CCE-JLW    Document 64    Filed 12/08/25    Page 11 of 18

dedicated Settlement Website, which went live on November 4, 2025. The Settlement Website provides comprehensive information about the Settlement, including a description of the Settlement benefits, the method of calculating the benefit increases, relevant deadlines, Frequently Asked Questions, downloadable Court documents, and the complete Long-Form Notice.

38. The structure and timing of the notice program were designed to ensure that Settlement Class Members had adequate time to review the Settlement and determine whether they wished to object. Based on my supervision of the notice process, I attest that the schedule and manner of dissemination provided Class Members a full and fair opportunity to review the Settlement terms. Because the Settlement provides automatic recalculation and adjustment of pension benefits through the Plan's payment system, no claim forms were required for Settlement Class Members to receive relief under the Settlement. Throughout the notice period, Angeion monitored and responded to inquiries from Settlement Class Members received through the toll-free helpline, dedicated email address, and Settlement Website. As of December 1, 2025, Angeion had handled approximately 55 inquiries from Class Members requesting information or seeking mailed copies of the Long-Form Notice. As of December 1, 2025, Angeion has reported zero objections to the Settlement.

### VI. Reasons the Settlement is Fair, Reasonable, and Adequate

39. I, and my firm, have substantial experience litigating complex class actions. A copy of SG's Firm Resume – Class Action is attached hereto as **Exhibit A**. I have been practicing law for nine years, with my practice focused primarily on complex litigation,

11

Case 1:23-cv-00833-CCE-JLW   Document 64   Filed 12/08/25   Page 12 of 18

class actions, and ERISA matters. For the past seven years, I have worked almost exclusively on ERISA actuarial equivalence cases and have worked on the majority of these types of cases that have been filed to date.[1] I am currently serving as counsel in several other actuarial equivalence lawsuits.[2] In addition to these matters, I am lead counsel in dozens of ERISA class actions.[3] These cases, like this one, raise important questions under ERISA's statutory and regulatory framework, including fiduciary duties, and

---

[1] *See Adams v. U.S. Bancorp*, 635 F. Supp. 3d 742 (D. Minn. 2022); *Belknap v. Partners Healthcare Sys.*, No. 19-cv-11437 (D. Mass.); *Berube v. Rockwell Automation Inc.,* No. 2:20-cv-01783 (E.D. Wisc.); *Brown v. United Parcel Service, Inc.,* No. 1:20-cv-00460-MLB (N.D. GA); *Cruz v. Raytheon Co.*, 435 F. Supp. 3d 350 (D. Mass. 2020); *Duffy v. Anheuser-Busch Cos., LLC*, 449 F. Supp. 3d 882 (E.D. Mo. 2020); *Herndon v. Huntington Ingalls Industries*, No. 4:19-cv-52 (E.D. Va.); *Matsen v. Metropolitan Life Insurance Company*, 543 F. Supp. 3d 25 (S.D.N.Y. 2021); *Skrtich v. Pinnacle W. Capital Corp.*, No. 22-cv-01753, (D. Ariz.); *Smith v. Rockwell Automation*, Inc., 438 F. Sup. 3d 912 (E.D. Wis. 2020); *Smith v. U.S. Bancorp,* No. 18-cv-3405 (D. Minn.); *Torres v. Am. Airlines, Inc.*, 416 F. Supp. 3d 640 (N.D. Tex. 2019).

[2] *See Watt v. FedEx Corp.*, No. 23-cv-02593 (W.D. Tenn.); *Landel v .Olin*, No. 25-cv-96 (D. Mo); *Parisi v. American Airlines, Inc.*, No. 25-cv-309 (N.D. TX); *Reichert v. Kellanova*, No. 23-cv-12343 (E.D. Mich.); *Whetstone v. Howard Univ.*, No. 23-cv-2409 (D.D.C.).

[3] *Artis v. GardaWorld*, No. 3:24-cv-00837 (W.D.N.C); *Williams v. Target Corp.*, 0:24-cv-03748 (D. Minn.); *Waggoner v. Carle*, No. 2:24-cv-02217 (C.D. Ill.); *Baker v. 7-Eleven*, 3:25-cv-01609 (N.D. Tex.); *Rogers v. Advocate Health*, 1:24-cv-08864 (N.D. Ill.); *Bokma v. Performance Food Group*, 3:24-cv-00686 (E.D. Va.); *Noel v. PepsiCo.*, 7:24-cv-07516 (S.D.N.Y); *Bailey v. Sedgwick Management*, 2:24-cv-02749 (W.D. Tenn.); *Spencer v. Campbell*,
1:24-cv-09882 (D.N.J); *Chirinian v. Travelers*, 0:24-cv-03956 (D. Minn.); *Greene v. Progressive*, 1:24-cv-01890 (N.D. Oh.); *Plesha v. Ascension*, 4:24-cv-01459 (E.D. Mo.); *Darrington v. Whole Foods*, 1:25-cv-00085 (W.D. Tex.); *Brewster v. Allied Universal*, 1:25-cv-00085 (C.D. Cal.); *Roman v. Walgreen*, 1:25-cv-01504 (N.D. Ill.); *Knight v. LHC*, 6:25-cv-00263 (W.D. La.); *Spence v. Casey's General Store*, 4:25-cv-00113 (S.D. Io.); *Leslie v. Rentokil*, 5:25-cv-01423 (E.D. Pa.); *Simpson v. Inspire*, 1:25-cv-02058 (N.D. Ga.); *Williams v. Bally's*, 1:25-cv-00147 (D.R.I); *Hatheway v. International Automotive*, 1:25-cv-07989 (N.D. Ill.); *Schultz v. Glens Falls*, 1:25-cv-00581 (N.D.N.Y); *Janosky v. USPI*, 2:25-cv-00068 (E.D. Ky.); *Pinckney v. Nordstrom*, 2:25-cv-01396 (W.D. Wash.).

12

prohibitions on discrimination in welfare benefit plans.

40. Based on that experience and my personal involvement in every stage of this case, I believe the proposed Settlement is fair, reasonable, and is in the best interests of the Class. The Settlement was reached only after contested motion practice, full briefing in the Fourth Circuit, targeted data exchanges sufficient to model class-wide relief, and a full-day, arm's-length mediation with Mr. Meyer.

41. This case has notable litigation risks, which is why a negotiated result is prudent. Plaintiff's actuarial equivalence theory is legally and technically complex, has not been tested through trial, and remains unsettled at the appellate level.[4] Defendants vigorously dispute liability and would present competing actuarial testimony in a classic "battle of the experts." The risks inherent in a "battle of the experts" are significantly compounded, here, by the pending Fourth Circuit appeal in which Defendants are pressing jurisdictional and arbitrability defenses, especially given the North Carolina's decision in *Canteen* (concluding that when parties have mutually agreed to a unilateral change-of-terms provision, said provision must be enforced as it is written, and that a unilateral addition of an arbitration provision made pursuant to change-of-terms provisions is not illusory and complies with the covenant of good faith and fair dealing if the changes reasonably relate to subjects discussed and reasonably anticipated in the original agreement.). An adverse ruling on appeal could eliminate class wide relief altogether and

---

[4] *See Drummond v. Southern Container Co.*, No. 24-12773 (11th Cir. Aug. 28, 2024); *Reichert v. Kellog Co.*, 24-1442 (6th Cir. May 17, 2024); and *Watt v. FedEx Co.*, No. 24-5945 (6th Cir. Oct. 17, 2024).

13

splinter claims into individual arbitration proceedings. Against those risks, the Settlement delivers certain, ongoing increases to the monthly benefits of more than 700 retirees and beneficiaries, without the delay and uncertainty of further litigation.

42. The Settlement was reached in an arm's-length process with nationally renowned defense counsel and overseen by an experienced mediator in the field. The negotiations were hard-fought and free of collusion. By then, the Parties had exchanged the data needed to evaluate exposure and relief, and both sides had the benefit of expert analysis. Importantly, Defendants are represented by Morgan, Lewis & Bockius LLP, whose ERISA litigation team is nationally renowned for its skill and experience. I have personally litigated against this team in multiple ERISA class actions, including other actuarial equivalence cases, and I am currently facing them in at least one other matter. Their advocacy is consistently strong and sophisticated, which further underscores its fairness.

43. Using the data produced by Plaintiff's expert, I performed calculations to assess the relief provided under the Settlement. Those calculations show that the Settlement provides average relief of roughly $14 *every month* to each participant for the rest of his or her life. These benefits—amounting, on average, to over $150 each year—are meaningful and substantial. The median monthly adjustment of $8.82 confirms that typical participants are receiving fair relief, while many others receive more, which explains why the average is higher. The modest standard deviation of $14.61 reflects that the distribution of relief is reasonably balanced, without extreme disparities. Further, nearly half of all Class Members (46%) receive $10 or more each month, underscoring that significant

14

benefits are widely shared across the Class. Taken together, these figures confirm that the Settlement is equitable, substantial, and well within the range of fair and adequate class action resolutions.

44. Based on my experience litigating actuarial equivalence cases, I believe this Settlement falls within the range of acceptable results when compared to other class actions in this area. Courts have approved recoveries of a similar magnitude. For example, recoveries of 27% in *Berube v. Rockwell Automation Inc.*, No. 2:20-cv-01783 (E.D. Wis.), 22% in *Herndon v. Huntington Ingalls, Inc.*, No. 4:19-cv-00052 (E.D. Va.), and 33% in *Skrtich v. Pinnacle West*, No. 2:22-cv-01753-SMB (D. Ariz.) were all approved as fair and reasonable. Notably, these cases all settled after considerable discovery and multiple depositions. By contrast, in *McFadden v. Sprint Communications, LLC*, No. 2:22-cv-02464 (D. Kan.), the court approved a 24% recovery, even though that settlement was reached before any formal discovery; however, there was no risk of appellate reversal. Here, the nearly 20% recovery achieved was obtained at an earlier stage than many other actuarial equivalence cases and while a live appeal presented serious risks that could have eliminated the Class claims entirely. In my judgment, securing over 17% of potential damages under these circumstances is a strong and fair result for actuarial equivalence settlements.

45. The Settlement's plan of allocation and method of distribution are also fair, rational, and equitable. The Settlement provides a *pro rata* allocation that applies the same formula to all Class Members, ensuring each receives the same percentage recovery relative to the present value of their past and future benefits. It also remedies the alleged harm in the same form in which it was suffered: by increasing Class Members' ongoing

15

monthly annuity payments. Because benefits will be adjusted directly through the Plan's existing payment system, Class Members are not required to submit claim forms, and distribution will occur automatically, with no risk of reversion to Defendants. The allocation method also accounts for equitable treatment among Class Members because while the dollar amounts of benefit increases will vary, each participant receives the same percentage of the present value of their benefits, depending on the form of benefit. Moreover, for Class Members who retired earlier and therefore have fewer anticipated future payments remaining, the calculation includes the value of past benefit payments, giving those payments the same weight as future benefits. In my view, this structure ensures that the Settlement's allocation method is rational, treats Class Members equitably relative to one another, and distributes relief effectively without unnecessary administrative hurdles.

46. Also, Ms. Franklin supports the Settlement. To date, Ms. Franklin has been an exemplary representative. She communicated to me that she spent significant time reviewing pleadings, gathering her relevant documents, and communicating with counsel to frame the claims; she was also consulted throughout the settlement process. She understands the nature of her claim and acknowledges her responsibilities as class representative and seeks to maximize relief for all Plan participants who received JSAs. Her claims are the same as those of all Class Members, and the relief that she is seeking is based on the same formula as that used for all Class Members. There are no conflicts between her and other Class Members, and no indication that she would prioritize her own recovery at the expense of the Class.

I declare, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: December 8, 2025

Respectfully submitted,

By: */s/ Oren Faircloth*
Oren Faircloth

**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
ofaircloth@sirillp.com